Filed 4/6/16  P. v. Logwood CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>LARON MICHAEL LOGWOOD,<br><br>  Defendant and Appellant. | A138142<br><br>(Alameda County<br> Super. Ct. No. 163503) |

     This is an appeal from final judgment after the jury found appellant Laron Michael Logwood guilty of second degree murder, enhanced for personally and intentionally discharging a firearm causing death.  Appellant challenges this judgment on the grounds that the trial court incorrectly instructed the jury with respect to his theory of imperfect self defense, prejudicially erred by admitting evidence relating to his invocation of the constitutional right to counsel, and prejudicially erred by denying his motions to strike or for mistrial based upon the use by the prosecution at trial of a privileged communication.  In addition, appellant raises related challenges based on the failure of his attorney to render effective legal assistance and based on the doctrine of cumulative error.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

     On May 5, 2010, a criminal information was filed charging appellant with the murder of Edwin Grady on July 16, 2009 (Pen. Code, § 187) (count one), enhanced for personal and intentional use of a firearm (Pen. Code, § 12022.53, subds. (a)-(d), (g)), and

1

possession of a firearm by a felon (Pen. Code, § 12021, subd. (a)(1)) (count two). Three prior felony convictions were also alleged pursuant to Penal Code section 667.5, subdivision (b).[1]

On November 7, 2012, appellant admitted the prior felony conviction allegations in a bifurcated trial and pled no contest to count two. The trial court accepted the plea and found him guilty of being a felon in possession of a firearm. A jury trial then began on the remaining count and allegations, resulting in the following record.

## I.     The Prosecution's Case.

### A.     The Shooting.

On July 16, 2009, 19 year-old, Ronesha Fields left the Oakland apartment of her father, Robert Fields, Sr., at 85th and Bancroft Avenue to buy juice at a nearby store, Arrwa One Stop Market (hereinafter, the market). When leaving, she was confronted by Shawn Hampton, who accused Ronesha of selling marijuana in front of the market. Their argument got "out-of-hand," so Ronesha left the market before deciding to return a short time later with her cousin, Deshawn Davis. This time, before they reached the market, Hampton approached Ronesha again and punched her in the jaw. The victim in this case, Edwin Grady, was standing nearby at the time. As Davis pulled Hampton back, Ronesha called 911. However, she promptly hung up the phone and returned to her father's apartment after Hampton and two other men threatened to "beat [her] ass" and "shoot up [her] daddy['s] house" if she called the police.

Once at her father's apartment, Ronesha again called police. She then called a few others, including her close friend, appellant, to report having been hit in the jaw. Appellant advised her to call the police. Ronesha then called her mother, Cimphonie Stephens, in San Leandro to report that Hampton may have broken her jaw, before retiring to her bedroom to lay down. Stephens decided to drive over to see Ronesha, and picked up appellant along the way. Several other people likewise stopped by to check on Ronesha after getting word of the incident, including her brother, Robert Fields, Jr., his

---

[1]     Unless otherwise stated, all statutory citations herein are to the Penal Code.

2

friend Jeremy Redwood, and her sister and stepsister, Dominique and Porsha, respectively.

At about 1:03 p.m. a police officer arrived on the scene, but was unable to locate the person who had called 911.

Eventually, Robert Fields, Jr., Jeremy, and appellant left the apartment to go to a "smoke shop" across the street from the market to buy Swishers for smoking marijuana.[2] Ronesha, her boyfriend, Deandre, and some of appellant's friends, including Winston Calendar and Jameel Wiggins, then joined the threesome in front of the market to smoke. All in all, about 20 people were outside the market. As Ronesha was telling her brother and appellant more details about what had occurred earlier in the day, a white Infiniti drove by, swerved into the bike lane, made two U-turns and then parked in front of the market.

The 25-year-old victim, Grady, and his passenger, Lashawn Taylor, stepped out of the car, prompting appellant to walk over to a light pole in front of the crowd to better position himself to defend his friends if necessary. As Taylor entered the market, Robert Fields, Jr., greeted Grady, a friend, before passing the marijuana to appellant, who was standing between Robert and Grady. Wondering aloud about the identity of the people gathered outside the market, Grady stated: "Who the fuck is these niggahs landscaping?" Robert explained they were there because Ronesha had been punched earlier, to which Grady replied: "Oh, that shit happened earlier. That shit gonna get worse."

At this point, appellant interjected: "Are you talking about worse for me or are you talking worse for [Ronesha]?" Grady answered: "Yeah, I'm talking to you, I'm talking to her. I'm talking to whoever." Grady and appellant approached one another, and appellant told him: "I can stand wherever I want to." He then added, "You can own this street or block, but you can't own nobody." Grady reacted by placing his hand on appellant's chest, while "clutch[ing] and grip[ping]" his waist area. According to

---

[2] A Swisher is a cigar that has a wrapper that can be used to smoke marijuana by removing the tobacco and replacing it with marijuana. One Swisher-made joint contains about three times the marijuana of a regular "joint."

3

Ronesha, it appeared Grady had a gun and was ready to use it. She tried to calm Grady down, as appellant walked away. However, appellant suddenly pushed Robert Fields, Jr., out of the way and pulled out a gun. A gunshot was heard, and Grady, holding the middle of his chest, said, "Oh, shit," before walking about 18 feet and collapsing. Ronesha, appellant and others scattered.

When Taylor exited the market, he saw Grady on the ground with about 20 people crowded around him. Grady's father-in-law, Michael Nelson, who lived nearby, attempted unsuccessfully to administer CPR. A bullet hole was visible in Grady's chest. According to Nelson, Grady was not carrying a gun.

### B.     The Police Investigation.

Oakland Police Officers Timothy Scarrott and Chad Ingebrigtsen were the first to arrive at the scene at about 2:08 p.m. One officer attempted CPR to no avail, and the victim was ultimately declared dead upon arrival after being transported by ambulance to a nearby hospital. A subsequent autopsy revealed the cause of death as a gunshot wound to the torso.

Neither Officer Scarrott nor Officer Ayala, who assisted in securing the crime scene, found any weapon or firearm on or near the victim. One bullet casing was found near the front of the market. Officers also discovered surveillance videos of the crime from four security cameras located inside and outside the market.

Sergeant Tony Jones, the homicide investigator assigned to the case, and his partner Sergeant Fleming, later watched these videotapes. Sergeant Jones recognized appellant on one of the videotapes as the person seen firing the gun. Sergeants Jones and Fleming interviewed several witnesses identified from this videotape, including Dominique and Ronesha. Dominique confirmed that the person recognized as the shooter by Sergeant Jones was appellant.

Ronesha was interviewed on July 22, 2009. She stated that Hampton had hit her earlier in the day, but claimed she was in the market when the victim was shot. Ronesha would not place appellant at the market during the shooting, and denied talking to anyone in front of the market, even though she is seen on the videotape talking to appellant in

4

front of the market just before the shooting. Sergeant Jones advised Ronesha that he suspected her of being involved in the shooting.

During a break in Ronesha's interview, Sergeant Jones called her mother, Cimphonie Stephens, and spoke to her for about 40 minutes. Afterward, Ronesha was much more cooperative, acknowledging that she talked to appellant outside the market, and that she believed he had shot and killed the victim. She explained that, prior to the shooting, the victim was unhappy that unfamiliar people were gathered near his spot in front of the market, and that he wanted them to leave. Ronesha did not state that the victim had a gun or threatened anyone.

At trial, Ronesha backtracked, denying that she told Sergeant Jones appellant shot and killed the victim.

On July 23, 2009, Sergeants Jones and Fleming interviewed Robert Fields, Jr. Robert identified appellant in a photo lineup, and explained that appellant and the victim had engaged in a heated argument in front of the market. He further explained that appellant had pushed him out of the way before reaching down and pulling "the thing" out really quickly. According to Robert, after the shooting, appellant ran around the corner toward 85th Avenue.

Similar to Ronesha, Robert Fields, Jr., backtracked from his original statements at the preliminary hearing, stating that everything he told the police was a lie to "save his ass." Robert explained that he had been sitting down, smoking marijuana at the time, and did not see the shooting. Robert could not be located at the time of trial.

On July 26, 2009, several police officers located and chased down appellant. At 4:44 p.m. that day, Sergeants Jones and Fleming interviewed appellant for less than one hour. Appellant was advised of, and waived, his *Miranda* rights, before talking to the officers.[3] He did not admit shooting the victim, nor claim to have felt threatened by the victim at the market. Following the interview, appellant was charged with murder.

---

[3]  *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Sergeant Jones never received any evidence that the victim was armed on the day in question.

On July 28, 2009, Sergeants Gantt and Fleming interviewed Jeremy Redwood, who identified appellant in a photo lineup as the person with the gun at the market on the day in question. Redwood stated that he could tell something was about to happen just before the shooting. A few months later, the prosecution team interviewed Redwood in jail, and he was not cooperative. At trial, Redwood claimed to not recall anything, explaining that he had been very intoxicated on the day in question. He also claimed not to remember giving his statements to police on July 28, 2009.

## II. The Defense Case.

Appellant testified in his own defense. He explained that, on the day in question, his cousin, Cimphonie Stephens, had called him distraught about Ronesha being punched in the jaw by Hampton. Ronesha, grabbing the phone, told appellant that "some guy came around, and [] said they were going to shoot up [her father's] house if she called the police again." Appellant had previously heard that, about six months ago, Hampton shot a girl. Appellant told Stephens to pick him up, and then went to get his loaded gun from his mother's house, believing that arming himself would be the "safest thing" under the circumstances. Appellant concealed his gun, which was loaded and cocked with a bullet in the chamber and no safety, in his waistband.

Appellant, after arriving at the apartment of Robert Fields, Sr., learned Ronesha's jaw was not broken and, thus, decided to call some friends to smoke marijuana. Eventually, after purchasing some Swishers at a nearby store, he assembled with a group of friends at the market. It was at this point that Grady (the victim) arrived in a white Infiniti SUV, revving the engine and driving aggressively. Appellant was scared, believing Grady was one of the persons who had earlier threatened Ronesha. Appellant moved to the front of the crowd, next to a light pole, to be in a better position in case he needed to fire his gun to protect his friends and family. He was "pretty sure" Grady was armed, as Grady appeared to tuck something under his waistband before exiting his

vehicle. Moreover, when Grady walked by appellant after stepping out of the vehicle, appellant saw something near his hip "bulging out of his shirt."

At this point, heated words were exchanged between appellant and Grady, as Grady was clearly angered by the presence of this group of people standing "in [his] spot," where he was known to sell drugs. According to appellant, Grady "hitched up his pants," a street gesture indicating that he was armed. The situation escalated even further when Grady put his hand on appellant's chest. Although Ronesha attempted to calm Grady down, appellant, nervous and scared, pulled out his weapon and fired a single shot as Grady moved his right hand toward his hip.

Appellant acknowledged being relieved after shooting Grady, first, because none of his friends or family had been shot and, second, because Grady, who had run off, did not appear seriously injured. Appellant then left the scene, walking up the street and hopping a fence into a creek area, where, after walking some distance, he disposed of his gun. When he later learned from Stephens that Grady was dead, appellant was in shock and scared. He had not intended to kill Grady, but only to shoot him in the leg so as to protect himself and others.

Appellant also testified at length regarding his personal background and, in particular, growing up on the rough streets of Oakland. An accomplished basketball and football player, appellant, age 36 at the time of trial, left the Bay Area after high school to play for several college teams on athletic scholarships. However, he ultimately returned to Oakland without a degree after leaving or being asked to leave several institutions. The last straw occurred when he was playing basketball for Menlo Atherton College. While away from campus visiting old friends in the Bay Area, appellant was shot in the foot and, as a result, lost his scholarship, effectively ending his sports career.

Back in Oakland, appellant had several more traumatic experiences, including being involved in at least three separate drive-by shootings. During one such incident, appellant's friend, seated next to him in a car, was shot and killed. Appellant also described being stabbed by his brother during an argument.

Appellant acknowledged that, around 2000, he began hanging out and selling drugs in the High Street area. He initially acknowledged being "[c]onsidered" as "one of the Upper High Street Boys," a group police had identified as a gang. However, when defense counsel later asked appellant directly whether he had ever been a member of either the Upper High Street or Lower High Street gangs, appellant responded, "No."

On cross-examination, appellant confirmed a feud in his neighborhood between the Upper High Street and Lower High Street groups. Appellant acknowledged that, on at least one of the occasions when he had been shot, he was with a friend associated with the Upper High Street Boys, and that the shooter was associated with their rival, the Lower High Street Boys. It was due to his repeated exposure to violence that appellant began to arm himself.

Ronesha testified for the defense that she identified appellant to Sergeant Jones as the shooter only because she was scared. Ronesha claimed Sergeant Jones threatened that she would go to jail if she failed to agree with what he was saying. Ronesha further testified that she believed the victim had a gun and that he intended to use it before he was killed.

Dr. Rahn Minagawa, an expert in trauma, substance abuse and gangs, testified regarding cumulative "complex trauma," a condition that can trigger hypersensitivity to danger in individuals living in violent environments. Dr. Minagawa responded "Absolutely," when asked whether a person "exposed to numerous acts of being shot at, beaten, stabbed threatened by others, witnessed friends getting assaulted, numerous friends being shot at, wounded, and grew up in an environment of high presence of gangs and violence, would . . . be at risk to develop complex trauma." On cross-examination, Dr. Minagawa admitted that he did not interview, evaluate or examine appellant, and had not diagnosed him with cumulative complex trauma. He also acknowledged that cumulative complex trauma is not included as an official diagnosis in the fifth edition of the Diagnostic and Statistical Manual for Mental Disorders, a well-known mental health reference text.

8

## III.    The Verdict, Sentencing and Appeal.

On January 14, 2013, after deliberating for two days, the jury found appellant not guilty of first degree murder, but guilty of the lesser offense of second degree murder, committed by the personal and intentional discharge of a firearm.  On February 13, 2013, the trial court sentenced appellant to a total term of 40 years to life with respect to count one, enhanced for personal use of a firearm.  The court then imposed a two-year concurrent term with respect to count two, possession of a firearm by a felon, and struck the prior conviction allegations.  Appellant filed a timely notice of appeal on February 25, 2013.

## DISCUSSION

Appellant raises the following issues on appeal.  First, appellant argues the trial court incorrectly instructed the jury with respect to the relevance of evidence of his voluntary intoxication for purposes of his theory of incomplete self defense.  Alternatively, appellant contends that, if we determine this issue was not properly preserved for review, his trial attorney then rendered ineffective assistance in violation of his constitutional rights to counsel and a fair trial.  Second, appellant contends the trial court violated his constitutional rights to due process by admitting certain evidence relating to his invocation of rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  Third, appellant contends his attorney rendered ineffective assistance by providing the prosecution a copy of the attorney's confidential letter to defense expert, Dr. Minigawa, which discussed appellant's past history and experiences with gangs and violence.  Finally, in the alternative, appellant contends the trial court prejudicially erred by denying his motions to strike and for mistrial based upon the prosecution's use of this letter at trial.  We address each of these issues in turn below.

## I.    Jury Instruction on Voluntary Intoxication/Imperfect Self Defense.

Appellant first contends the trial court erred when instructing the jury pursuant to CALCRIM No. 625.  Specifically, the trial court instructed the jury as follows:  "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with

9

an intent to kill or the defendant acted with deliberation and premeditation or the defendant acted with conscious disregard for human life with knowledge that his conduct was life-endangering. [¶] *You may not consider evidence of voluntary intoxication for any other purpose*." (Italics added.) According to appellant, even if this instruction is correct in the abstract, the instruction was incorrect in this case because it precluded the jury from considering evidence of his voluntary intoxication for purposes of his defense of incomplete self defense. (See § 29.4, subd. (b) ["Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought"]; *People v. Saille* (1991) 54 Cal.3d 1103, 1119 ["Intoxication is now relevant only to the extent that it bears on the question of whether the defendant actually had the requisite specific mental state"].)[4]

Appellant did not request that the jury be instructed at trial regarding its consideration of evidence of his voluntary intoxication on the issue of his claim of imperfect self defense. However, appellant insists on appeal the trial court nonetheless had a sua sponte duty to instruct jurors on voluntary intoxication as it related to his defense. Appellant reasons that, while there is generally no sua sponte duty to instruct on voluntary intoxication (*People v. Castillo* (1997) 16 Cal.4th 1009, 1014 ["instruction relating intoxication to any mental state is . . . 'more like the "pinpoint" instructions' that

---

[4]     "Subdivision (b) of section 22 [renumbered section 29.4, effective January 2013] establishes, and limits, the exculpatory effect of voluntary intoxication on the required mental state for a particular crime. It permits evidence of voluntary intoxication for limited exculpatory purposes on the issue of specific intent or, in murder cases, deliberation, premeditation and express malice aforethought. The absence of implied malice from the exceptions listed in subdivision (b) is itself a policy statement that murder under an implied malice theory comes within the general rule of subdivision (a) such that voluntary intoxication *can serve no defensive purpose*. In other words, section 22, subdivision (b) is not 'merely an evidentiary prescription'; rather, it 'embodies a legislative judgment regarding the circumstances under which individuals may be held criminally responsible for their actions.' ([*Montana v*.] *Egelhoff* [(1996)] 518 U.S. [37,] 57 (conc. opn. of Ginsburg, J.).)" (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1300 [italics added].)

'are not required to be given sua sponte' "]), such duty arises where, like here, a jury is partially instructed on a topic and failure to give a more complete instruction would be confusing or misleading to the jury. (*Id.* at p. 1015 ["Even if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly"].)

Appellant's reasoning suffers several flaws. First, his argument ignores the "long-standing general rule . . . that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given." (*People v. Rundle* (2008) 43 Cal.4th 76, 145 ["Any lack of clarity regarding the consideration, if any, the jury should give to evidence of voluntary intoxication, in the absence of a request for an instruction on this subject, is of the defendant's doing, and on appeal he cannot avail himself of his own inaction"], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 394.) Undisputedly, appellant failed to request any clarification or modification of the voluntary intoxication instruction given to the jury at trial. As such, he cannot argue on appeal that the trial court's instruction, otherwise correct in law, was too general or incomplete in his case.[5] (*People v. Rundle, supra,* at p. 145; see also *People v. Guiuan* (1998) 18 Cal.4th 558, 570 [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "].)

Second, even assuming for the sake of argument the jury should have been instructed regarding its consideration of evidence of appellant's voluntary intoxication for purposes of his claim of imperfect self defense, on this record, we find no undue prejudice. To explain, we begin with the substantive law.

---

[5] The People contend part of this instruction — to wit, the part appellant does not challenge which permitted the jury to consider voluntary intoxication evidence when determining whether appellant "acted with conscious disregard for human life" — is incorrect under California law. (See § 29.4, subd. (b).) Appellant does not respond to this contention. However, for reasons that will become clear, we need not address it for purposes of deciding this appeal. (See § 29.4, subd. (b).)

"The elements of murder are (1) an unlawful killing of a human being . . . (2) committed with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188.) Malice is implied 'when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.' [Citation.]" (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1296.)

On the other hand, "[m]anslaughter is the unlawful killing of a human being without malice." (§ 192.) " '[O]ne who kills in imperfect defense of others — in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury—is guilty only of manslaughter.' [Citation.] . . . To satisfy the imminence requirement, '[f]ear of future harm — no matter how great the fear and no matter how great the likelihood of the harm — will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.'* . . . [¶] . . . " Put simply, the trier of fact must find an *actual* fear of an *imminent* harm.' (*In re Christian S.* (1994) 7 Cal.4th 768, 783 [30 Cal.Rptr.2d 33, 872 P.2d 574].) . . . [¶] Imperfect defense of others, like imperfect self-defense, is not a true defense, but a shorthand description for a form of voluntary manslaughter. (See *People v. Elmore* (2014) 59 Cal.4th 121, 134 [172 Cal.Rptr.3d 413, 325 P.3d 951]; [*People v.*] *Randle* [(2005)] 35 Cal.4th [987,] 997 [defendant lacked malice required for murder].) It follows that voluntary manslaughter arising from the imperfect defense of another is a lesser included offense of the crime of murder." (*People v. Trujeque* (2015) 61 Cal.4th 227, 270-271. See also *People v. Elmore* (2014) 59 Cal.4th 121, 138-139 ["unreasonable self-defense entails a reaction that is ' "caused by the circumstances," ' " rather than one based upon the defendant's "purely delusional perceptions of threats to personal safety"].)

Thus, section 29.4, the statutory basis for CALCRIM No. 625, "often comes into play in a homicide case when an offender accused of murder or manslaughter was

12

voluntarily intoxicated. Initially enacted in 1872, [former] section 22 [now renumbered section 29.4] sets forth the general principle in this state that a criminal act is not rendered less criminal because a person commits the act in a state of voluntary intoxication. [Fn. omitted.] Evidence of voluntary intoxication is not allowed to negate the capacity to form any mental states for the crimes charged. However, such evidence is admissible on the issue of whether the defendant *actually* formed a required specific intent or, with respect to a charge of murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought. (*Id.*, subd. (b).)" (*People v. Timms, supra,* 151 Cal.App.4th at pp. 1296-1297.)

For purposes of imperfect self defense, "whether the defendant actually held the required belief is to be determined by the trier of fact based on all the relevant facts." (*In re Christian S., supra,* 7 Cal.4th at p. 783.) Here, appellant contends his voluntary intoxication is one such relevant fact. (*People v. Cameron* (1994) 30 Cal.App.4th 591, 601 ["Proof of intoxication tends to support a claim of honest but mistaken belief in an imminent aggravated assault, providing a reason to account for the defendant's objectively unreasonable belief [in the need to defend himself]"] [*Cameron*], superseded on another point by section 29.4.) The prosecution, on the other hand, disagrees, contending *Cameron* is no longer good law.[6] The California Supreme Court has not definitely resolved this issue. However, for purposes of this case, we need not speculate as to how the high court might decide this. Simply put, on this record, even assuming instructional error, there was no prejudicial error.

Here, the record makes amply clear that appellant's imperfect self defense theory was based, not on his voluntary intoxication, but on several immediate, objective

---

[6]     The People reason as follows: "In 1995, . . . the Legislature amended section 22 to permit evidence of voluntary intoxication as to express malice, but not implied malice, in murder cases. (§ 22.) The 1995 amendment to section 22 was specifically intended to overrule [*People v.*] *Whitfield* [(1994) 7 Cal.4th 437]. (See *People v. Mendoza* [(1998)] 18 Cal.4th [1114,] 1133.) Since *Cameron* expressly relied on *Whitfield* and its holding is based on outdated authority, *Cameron* likewise was overruled by the 1995 amendment to section 22."

circumstances existing at the time of the shooting. As appellant himself explained, he decided to fire his gun after considering the victim's words and his body language, which were not only threatening, but which triggered in appellant the genuine belief that the victim had a gun in his waistband and was ready to use it. Specifically, the victim, who appellant described as irate, uncooperative and ready to "do something about it," kept dropping his right hand to a "bulge" visible at his hip, which appellant had already assumed was a gun.[7] Further, as the tension escalated, the victim aggressively placed his hand on appellant's chest. And, given appellant's extensive past experience with weapons and shootings (he had been involved in three separate drive-by shootings), appellant decided to fire his own weapon first to "get the upper hand" and prevent the shooting of any of his friends or family who were gathered at the scene. In appellant's own words: "I was real nervous, and I didn't like the situation I was in. I wish I wasn't even there. At that time, I was kind of nervous, scared."

The record also reflects that appellant at no point stated or even suggested that his marijuana use was a factor in his decision to, first, bring a firearm on the day in question or, second, to subsequently use it to fire a shot at the victim. On direct examination, appellant acknowledged going to his mother's house in San Leandro to retrieve his loaded weapon before travelling on to Oakland to check on Ronesha. On cross-examination, appellant acknowledged that he not only knew what he was doing when he fired his gun, he deliberately "fire[d] a bullet directly into [the victim's] body" (although he did not intend to kill him). Further, when directly asked whether he was "so stoned that you didn't know what was happening," appellant responded, "No." In fact, according to appellant's testimony, he recalled exactly what happened and what he was thinking on the day in question. In other words, appellant effectively denied that his voluntary intoxication was what triggered his actual belief in the need to defend against

---

[7]     In particular, the victim had already warned Ronesha, who was trying to calm him down, that, "It's about to get worser [sic] than you getting punched," and had warned appellant that he was about to, " 'wake this motherfucker up,' [which] mean like he gonna shoot his gun at everybody over here."

imminent peril at the hands of the victim.  (Compare *People v. Wright* (2005) 35 Cal.4th 964, 974 [where "the circumstances at the time of the shooting only weakly support the conclusion that defendant was acting at that time under a delusional belief that he was under attack," any error in excluding additional evidence that defendant suffered delusional thoughts prior to the shooting was harmless beyond a reasonable doubt].)

Finally, appellant presented testimony from expert witness Dr. Minagawa that individuals, like appellant, exposed to excessive violence during their lives can suffer from cumulative "complex trauma."  This condition, Dr. Minagawa explained, can cause a distorted sense of reality, including an unreasonable belief in the need to defend against perceived threats.  Reinforcing this testimony, defense counsel argued in closing that appellant in fact suffers from complex trauma, causing him to "see[] the world as a very threatening place."  Pointing out that appellant had been shot three times, stabbed, and once beaten into a concussion, defense counsel urged the jury to "see the world through [appellant's] eyes to know what he did was reasonable from his view."  While defense counsel added that appellant's substance abuse is another likely symptom of this complex trauma, he did not argue that appellant's intoxication on the day in question led him to fire his gun.

Under these circumstances, we conclude the lack of a pinpoint instruction to the jury clarifying the relevance of voluntary intoxication evidence to appellant's imperfect self defense theory was harmless, whether assessed under the *Watson* standard of prejudice or the more stringent *Chapman* standard.[8]  (See *Chapman v. California* (1967)

---

[8]     The People contend prejudice should be assessed under *People v. Watson* (1956) 46 Cal.2d 818, 836, citing the following California Supreme Court authority:  "The sua sponte duty to instruct fully on all lesser included offenses suggested by the evidence arises from California law alone.  Moreover, a failure to fulfill this duty is not a structural defect in the proceedings, but mere misdirection of the jury, a form of trial error committed in the presentation of the case.  Hence, by virtue of the California Constitution, reversal is not warranted unless an examination of 'the entire cause, including the evidence,' discloses that the error produced a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.)  This test is not met unless it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred.

15

386 U.S. 18.) Simply put, the jury had a wealth of evidence before it regarding external circumstances that might have caused appellant to believe he needed to act in self defense, including the visible "bulge" on the victim's right hip that appellant believed was a gun, the victim's by-all-means menacing behavior (including his act of hitching up his pants which, on the street, is used to indicate the presence of a gun), and appellant's cumulative traumatic violent experiences. And while appellant testified at length regarding these external factors and their influence on his decision to shoot the victim, appellant at no time testified that his intoxication was an influential factor, insisting, to the contrary, that he was not so stoned that he lacked full understanding of his actions. Indeed, appellant gave a precise and detailed account of the entire incident, admitting his intent to shoot the victim, while disclaiming that his intoxication impacted his decision making. Thus, given the paucity of intoxication evidence, particularly when considered in light of the fact that the defense's primary theory at trial was that appellant's personal trauma, not intoxication, triggered his decision to shoot the victim, we conclude that it is not reasonably probable the jury would have convicted him of the lesser offense of voluntary manslaughter had it been instructed to consider his intoxication on the issue of imperfect self defense and, moreover, that any failure to so instruct must be deemed harmless beyond a reasonable doubt. (See *People v. Peau* (2014) 236 Cal.App.4th 823, 830-831.)

Accordingly, we conclude any error with respect to the trial court's giving of CALCRIM No. 625 was harmless and provides no basis for disturbing the judgment.

---

(*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*).)" (*People v. Breverman* (1998) 19 Cal.4th 142, 149.) Appellant, in turn, relies on a recent decision from this District to argue the more-stringent *Chapman* standard applies. (See *People v. Thomas* (2013) 218 Cal.App.4th 630, 645 [concluding that, in a murder case, failure to give a heat-of-passion instruction implicates the federal Constitution].) However, because we conclude the purported error in this case was harmless under either standard, we need not take a position on this unresolved and complex legal issue.

16

**II.** **Ineffective Assistance of Counsel in Failing to Request Pinpoint Instruction on Voluntary Intoxication.**

Appellant raises the alternative argument that, even if the trial court had no sua sponte duty to instruct the jury that it could consider his voluntary intoxication for purposes of deciding whether he actually believed in the necessity of defending himself against imminent peril when shooting the victim, his attorney rendered ineffective assistance by failing to request such an instruction. However, where, as here, "the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.) Under California law, a strong presumption exists that counsel's conduct falls within the wide range of reasonable professional assistance. As such, " ' "the defendant must overcome the presumption that, under the circumstances, the challenged action '*might be considered sound trial strategy.*' " ' " (*People v. Burnett* (1999) 71 Cal.App.4th 151, 180, quoting *People v. Bunyard* (1988) 45 Cal.3d 1189, 1215 and *Strickland v. Washington* (1984) 466 U.S. 668, 689.)

Here, the appellate record contains no explanation for defense counsel's failure to request a pinpoint instruction relating appellant's voluntary intoxication to his theory of imperfect self defense. At no time was defense counsel asked to explain this failure, nor did counsel offer an explanation for it, either directly or indirectly. As such, under the standards set forth above, we must reject appellant's claim of ineffective assistance of counsel on direct appeal " 'unless there simply could be no satisfactory explanation.' (*People v. Pope* (1979) 23 Cal.3d 412, 426.)" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.)

Having reviewed the record, we conclude that, even assuming for the sake of argument the belatedly-sought pinpoint instruction was warranted in this case, a plausible tactical explanation exists for defense counsel's failure to request it, such that appellant's ineffective assistance claim fails. As explained at length above (pp. 13-16, *ante*), the

17

defense theory that appellant acted in imperfect self defense was based upon a multitude of external circumstances indicating the victim was ready and willing to shoot appellant or his friends and family, such that appellant believed it was necessary to "shoot first" to prevent the victim from getting the "upper hand." The defense also theorized that appellant's quick-to-the-trigger response stemmed at least in part from his personal history and, in particular, the cumulative impact of decades of exposure to violence on the streets of Oakland. Appellant's theory was not, to the contrary, that he was so intoxicated that he misperceived the nature of the threat posed by the victim. Indeed, defendant directs us to no evidence in the record whatsoever that his perceptions at the time of his crime were altered by his marijuana use. As such, defense counsel may have reasonably concluded that, as a tactical matter, it was preferable not to call attention to appellant's marijuana consumption, but to focus on other, more objective evidence in the record indicating the victim posed a very real and imminent threat. While appellant suggests defense counsel should have focused both on his intoxication *and* this external evidence, it is not our role on appeal to second guess an attorney's decision regarding matters of trial strategy. (*People v. Bunyard, supra,* 45 Cal.3d at p. 1215.)

Finally, and in any event, the record reflects the jury was given a comprehensive set of instructions regarding the prosecution's burden to prove each element of each crime beyond a reasonable doubt – including the element of intent to commit murder or manslaughter. Thus, based upon all of these relevant circumstances, we conclude there is no basis for finding prejudice on this record even if we could find deficient performance by counsel (which we cannot).

Accordingly, because appellant cannot prove the deficient performance by his counsel " 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result,' " his challenge based upon ineffectiveness of counsel fails. (*People v. Kipp, supra,* 18 Cal.4th at p. 366.)

### III. Admission of Appellant's Videotaped Statements During a Police Interview.

Appellant next contends the trial court denied him due process of law when it admitted into evidence his videotaped responses to police questioning on the day of his

18

arrest after he initially waived, but then ultimately invoked, his right to counsel under *Miranda, supra,* 384 U.S. 436.

The law of *Miranda* is well-established. "[U]nder the due process clause of the Fourteenth Amendment of the United States Constitution . . . an involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion is inadmissible in a criminal proceeding." (*People v. Neal* (2003) 31 Cal.4th 63, 67.) As such, a statement obtained by an officer from a suspect during a custodial interrogation "may be admitted in evidence only if the officer advises the suspect of both his or her right to remain silent and the right to have counsel present at questioning, and the suspect waives those rights and agrees to speak to the officer." (*Ibid.*) If at any time the suspect indicates that he does not wish to speak, or to continue to speak, to the officer, the interrogation must end and may not resume unless and until counsel is present or the suspect voluntarily initiates further contact. (*Ibid.*)

The prosecution bears the burden of proving the defendant's waiver of rights and subsequent incriminating statements were voluntarily, knowingly and intelligently made. (*People v. Whitson* (1998) 17 Cal.4th 229, 248.) A showing of voluntariness must be based on "all the surrounding circumstances," including the defendant's intelligence, sophistication and prior experiences, his mental and physical state at the time of interrogation, and the methods employed by his interrogators. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226; *People v. Guerra* (2006) 37 Cal.4th 1067, 1093, overruled on other grounds in *People v. Rundle, supra,* 43 Cal.4th at p. 151.)

On appeal, we "must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]' " (*People v. Johnson* (1993) 6 Cal.4th 1, 25.)

Here, the parties' dispute centers on whether the trial court prejudicially erred by admitting into evidence appellant's videotaped statements to Sergeant Tony Jones, made after appellant initially waived his *Miranda* rights, relating to whether he should stop the

19

interview to obtain legal advice. Specifically, appellant challenges the admission of the portion of the recorded police interview during which he is read the standard *Miranda* warnings, as well as the six or more times during the subsequent interrogation when he mentions the possibility of invoking the right to counsel. The parties agree that appellant was in custody at the time of this interrogation, and that he had been fully advised of, and voluntarily waived, his *Miranda* rights. However, according to appellant, given that he later stopped the interview and invoked his right to counsel, his "preliminary discussions about requesting counsel should be deemed part of his ultimate invocation" of *Miranda* and, as such, should not have been admitted at trial. We reject appellant's argument.

The relevant record from appellant's July 26, 2009 police interview reflects that he indeed mentioned the possibility of talking to a lawyer several times. However, in each instance, appellant did so when attempting to convince the interrogating officer, Sergeant Tony Jones, that he would provide more information if the officer would either let him call his mother or "baby mom," or let him see the videotape in which, according to Sergeant Jones, appellant is seen shooting the victim (which appellant denied). The following colloquy is representative of their interactions:

"[APPELLANT]: Let me use the phone, all right?

"[SERGEANT JONES]: I can't man.

"[APPELLANT]: You can. They said I can call somebody, man. You always, you always let people use the phone, man. I'm just needing, let me, let me talk to somebody. Then, feel me? Then we can – The only person I wanna talk to is really two people. My mom and my baby mom and that's it. And then y- you say this and this and this and whatever.

"[SERGEANT JONES]: I'm gonna let you use the phone before we leave here. I will do that.

"[APPELLANT]: I know. But I need to talk further before I can even tell you what happened.

"[SERGEANT JONES]: Can't do that man.

"[APPELLANT]: You can, man.

"[SERGEANT JONES]: The rules don't let us do that, man. Not during the interview. You can go out there and say, hey, clean the house up, they got me or anything.

"[APPELLANT]: I mean, come on, ain't clean the house up.

"[SERGEANT JONES]: I'm just saying, though, that's what the – that's why they got those kind of rules in place. This ain't my doing. It ain't like this. This is . . .

"[APPELLANT]: So if I don't, if I just be quiet like lawyer, and, wah wah, then, boom, still gonna let me use the phone?

"[SERGEANT JONES]: Yeah.

"[APPELLANT]: So that's what I'm saying. It – it's no more interview if I say lawyer, right?

"[SERGEANT JONES]: Yeah, that's right. It's over.

"[APPELLANT]: So, okay, let me use the phone.

"[SERGEANT JONES]: I – if you want – if you don't, look, this is the thing.

"[APPELLANT]: Okay, can I say lawyer. Then, uh, you let me use the phone? And then I renege?

"[SERGEANT JONES]: It – it, take the lawyer away?

"[APPELLANT]: Yeah.

"[SERGEANT JONES]: Man, no, it don't work like that.

"[APPELLANT]: Well, that's what—I'm trying to work with you here.

"[SERGEANT JONES]: Laron—

"[APPELLANT]: All I'm asking for is two things. . . .

"[SERGEANT JONES]: Laron, listen to me, man, listen to me. I don't—I don't—I don't really need you to work with me, man.

"[APPELLANT]: I know that.

"[SERGEANT JONES]: You need to work for yourself." (Supp II CT 503, line 685.)

The trial court, after reviewing the recorded interview, described appellant's lawyer requests as mere game playing, a description likewise suggested by Sergeant Jones when speaking to appellant during the interview. The record is indeed consistent with this description. What is more, the record supports the reasonableness of Sergeant

21

Jones's decision to continue questioning appellant about the crime until that time, later in the afternoon (and during a portion of the interview not played for the jury), when appellant clearly and unequivocally invoked his right to counsel. As the California Supreme Court has made amply clear, a defendant's invocation of the right to counsel must be clear and unambiguous. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105 [where "defendant's statement contains several ambiguous qualifying words ('I think,' 'probably,' and 'it'd'), we do not consider defendant's statement to be sufficiently clear in and of itself. (See *Davis* [*v. United States* (1994)] 512 U.S. [452,] 455 [" 'Maybe I should talk to a lawyer' "]; *People v. Stitely* (2005) 35 Cal.4th 514, 534 [26 Cal.Rptr.3d 1, 108 P.3d 182 [" 'I think it's about time for me to stop talking.' " (italics omitted)]."]].) As such, as the trial court in this case recognized, "the relevant inquiry is not what defendant thought he was saying, nor the ability of a defendant to clearly frame a request for counsel, but what a reasonable officer in light of the circumstances would have understood the statement to mean. If 'a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel,' questioning need not cease." (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1127.)

Here, we conclude that a reasonable officer in Sergeant Jones's position would not have understood appellant's "lawyer" references at these points of the interview to be unequivocal requests for counsel. Rather, the record, considered as a whole and in context, suggests appellant made the challenged lawyer references while attempting to bargain with Sergeant Jones for access to a telephone or the allegedly inculpatory videotape from the crime scene. As such, we conclude the trial court acted in accordance with the dictates of *Miranda* when admitting into evidence appellant's police interview statements. (*People v. Bacon, supra,* 50 Cal.4th at p. 1107 ["defendant's invocation of the right to counsel must be clear and unambiguous"]; see also *People v. Ray* (1996) 13 Cal.4th 313, 337 [" 'Volunteered statements of any kind are not barred by the Fifth Amendment' or subject to the prophylactic requirements of *Miranda*"].)

In so concluding, we reject any suggestion that Sergeant Jones was taking unfair advantage of appellant by withholding access to the phone or the crime-scene videotape

22

in order to coerce appellant into a confession. "In general, ' "any promise made by an officer or person in authority, express or implied, of leniency or advantage to the accused, if it is a motivating cause of the confession, is sufficient to invalidate the confession and to make it involuntary and inadmissible as a matter of law." ' [Citations.] . . . In identifying the circumstances under which this rule applies, we have made clear that investigating officers are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the accused speaks truthfully about the crime. [Citation.] The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." (*People v. Ray, supra,* 13 Cal.4th at pp. 339-340.) Here, we find no evidence of a psychological ploy by Sergeant Jones so coercive that it tended to produce a statement by appellant that was involuntary or unreliable. To the contrary, as the record excerpt from above reflects, Sergeant Jones advised appellant several times regarding his right to remain silent when questioned and to speak with an attorney. He also clarified that the rules did not permit appellant to make a phone call at that time. Moreover, we note that appellant was no stranger to the criminal justice system. Rather, he had numerous prior contacts with law enforcement and, indeed, had a prior personal relationship with Sergeant Jones, who the record reflects was a friend of his brother's. It is thus safe to assume appellant was familiar with the *Miranda* advisements, and was well aware of the consequences of invoking his right to counsel. These circumstances reinforce our conclusion that a reasonable officer in Sergeant Jones's position would not have understood appellant's references to a lawyer as unequivocal and unequivocal requests for counsel. Rather, had appellant truly desired to speak to a lawyer at these particular times during the interview, we conclude he would have made a much more clear request. However, in the absence of any clear request, the jury was entitled to consider appellant's statements in order to better gauge his credibility, particularly once he took the stand in his own defense. (See *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368-1689 ["the fact a witness expects to receive something in exchange for testimony may be considered in evaluating his or her credibility"); Evid.

23

Code § 780, subd. (h) ["the . . . jury may consider in determining the credibility of a witness . . . . [¶] . . . [¶] (h) [a] statement made by him that is inconsistent with any part of his testimony at the hearing"].)

Finally, and in any event, even if we assume for the sake of argument the trial court erred by admitting the challenged statements, we would nonetheless find no undue prejudice. Under California law, the test of prejudice for admitting a defendant's involuntary statements to police is rooted in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), requiring reversal unless the prosecution proves the error harmless beyond a reasonable doubt. (See also *People v. Sims* (1993) 5 Cal.4th 405, 447; *People v. Johnson, supra*, 6 Cal.4th at pp. 32-33.) Otherwise stated, under *Chapman*, an "error is harmless when it is found to be 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.]" (*People v. Gonzalez* (2012) 210 Cal.App.4th 875, 884. See also *id.* ["the proper test for prejudice requires consideration of not only the evidence that would support the judgment, but also the impact of the inadmissible evidence on the final outcome"].) Here, several factors demonstrate the harmless nature of this allegedly improper admission of evidence. While appellant's statements to Sergeant Jones may have been detrimental to his credibility, the fact remains appellant not only admitted shooting the victim at trial, he admitted doing so deliberately. Appellant also admitted he was not too intoxicated to understand what he was thinking or doing at the time. The challenged statements made by appellant during the police interview do nothing to cast doubt on these undeniably damaging facts.

Thus, because there is overwhelming admissible evidence in the record that appellant committed second degree murder, we conclude any purported error in admitting the challenged statements was harmless.[9]

---

[9] Our conclusion in this regard also disposes of appellant's related contention that his attorney rendered ineffective assistance by failing to move to exclude appellant's statements, prior to invoking the right to counsel, mentioning the possibility of speaking to a lawyer. Given that, for all the reasons stated, we find the trial court properly admitted this evidence, there is no basis for concluding defense counsel failed to comport

24

**IV. Errors Relating to the Prosecution's Receipt and Use of a Letter From Defense Counsel to Expert Dr. Minagawa Setting Forth Appellant's Personal History.**

Appellant raises two issues with respect to the prosecution's use at trial of a letter prepared by defense counsel for expert witness Dr. Minagawa to provide information about appellant's personal history, which he contends was confidential attorney-client work product. Initially, appellant contends his attorney rendered ineffective assistance by providing an unredacted copy of this letter to the prosecution during or before trial. In addition, appellant contends the trial court prejudicially erred by denying his motions to strike and for mistrial based on the prosecution's use of this letter when cross-examining Dr. Minagawa on the issue of appellant's gang ties. (See *People v. Roldan* (2005) 35 Cal.4th 646, 724, disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22 [" 'The attorney-client privilege is "a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer." [Citation.] That privilege encompasses confidential communications between a client *and experts retained by the defense*' "].) We address these issues in turn below.

Turning first to the claim of ineffective assistance, appellant argues his attorney prejudiced his rights by disclosing written correspondence to the prosecution that was protected from disclosure as a privileged communication or attorney-client work product. The People counter that defense counsel's decision to disclose this letter "fell within the wide range of reasonable professional assistance" because (1) its contents were relied upon by Dr. Minagawa to prepare for hypothetical questions at trial about the reactions of persons suffering from cumulative complex trauma,and (2) appellant himself testified regarding much of the letter's substance, including his gang associations and, more generally, growing up in "high danger areas where there is a high gang presence . . . ." We agree with the People.

As we have already discussed at length, the defense theorized at trial that appellant acted in imperfect self defense. Specifically, defense counsel argued that appellant,

---

with minimal constitutional standards of professionalism by declining to make such motion.

himself a victim of repeated acts of gun violence, had shot the victim in this case due to an irrational, albeit understandable, fear of imminent peril. Consistent with this theory, Dr. Minagawa, qualified as an expert in trauma, substance abuse and gangs, was examined by defense counsel regarding complex trauma, a condition causing individuals living in violent surroundings to develop hypersensitivity to risk. As part of this questioning, Dr. Minagawa testified about the traumatizing effect of growing up in areas with a "high gang presence," explaining: "There's a lot of violence, drive-by's, shootings, of that nature. Those are quite traumatizing." Dr. Minagawa responded "Absolutely," when asked by defense counsel whether a person "exposed to numerous acts of being shot at, beaten, stabbed, threatened by others, witnessed friends getting assaulted, numerous friends being shot at, wounded, and grew up in an environment of high presence of gangs and violence, would . . . be at risk to develop complex trauma."

The prosecution, in turn, questioned Dr. Minagawa about the materials he received in connection with this case. Dr. Minagawa acknowledged receiving and relying upon a letter from defense counsel, which he described as a four-page summary "of the defendant's trauma in the past" containing information about "defendant's gang affiliation" with the Upper High Street Boys.[10] At this point, the prosecution asked

---

[10] The relevant portion of Mr. DuBois' letter to Dr. Minagawa, which Mr. DuBois furnished to the prosecutor, reads as follows:

"Following is client history of quasi gang life in Oakland during which he has been literally shot three times and experienced the trauma of life on the streets of Oakland.

"History: Laron Logwood was raised primarily in a area of Oakland known as Maxwell Park which geographically sits just above (on top of) the High Street District of Oakland. High Street is divided into upper (North of the freeway H/W 580) and Lower High Street (South of H/w 580) . . . two groups of kids which satisfy the penal code definition of 'gangs' regard themselves as upper High Street and Lower High Street guys.

"Laron Logwood hung out with the Upper High Street guys, was regarded as an upper High Street guy and became known as the head of the Upper High Street guys, if for no other reason that he stayed longer in the group, was the older of the group, and therefore the obvious apparent leader of the group.

"As to the gang aspect of the group there was no 'jumping in' ritual. They were a group which hung out, smoked dope, sold a little dope AND after it was alleged that one

26

whether "violence is glamorized in gang life," to which the expert responded in the affirmative. When defense counsel then objected, the court overruled, explaining: "You offered him as a gang expert. He's allowed to render opinions [as to gangs]." Thus, continuing with his testimony, Dr. Minagawa confirmed, among other things, that "violence in the gang context also enhances an individual gang member's reputation."

In addition, appellant, testifying in his own defense, touched on many of the same themes as Dr. Minagawa. For example, appellant acknowledged that he was considered "one of the Upper High Street Boys," and that police had identified this group as a gang. He also acknowledged that, on the day in question, he was hanging out with his friend, Winston Calendar, who was likewise associated with the Upper High Street Boys. Nonetheless, when defense counsel asked appellant directly whether he had ever been a member of the Upper High Street Boys or Lower High Street Boys, appellant responded, "No." However, on cross-examination, appellant confirmed there was a feud in his neighborhood between the Upper High Street and Lower High Street gangs, and that he was once involved in a drive-by shooting during which, his friend, an Upper High Street Boy, was shot by a Lower High Street Boy.

As this record reflects, the information contained within the subject letter from counsel was wholly consistent with the defense theory that appellant acted in imperfect self defense when, due to his cumulative past traumatic experiences, he actually believed it was necessary to shoot the victim to protect himself or his loved ones from imminent peril. As such, defense counsel could have reasonably determined this letter was of strategic significance to the defense and, therefore, should be disclosed to the prosecution and used at trial during Dr. Minagawa's testimony, particularly where Dr. Minagawa relied on the letter to prepare his responses to hypothetical questions at trial about

---

or more of their number 'car jacked' a member of the lower High Street boys a feud developed between the upper and lower High Street boys which lasted for many years.

"Laron actually had numerous opportunities to achieve a productive, 'straight' life, but the 'gang' kept dragging him back in the sense that most of his close friends were in the group and he preferred their company to other available relationships." (Court exhibit 11.)

individuals suffering from cumulative complex trauma. While appellant suggests otherwise, there is nothing inherently improper about the waiver of privilege by defense counsel. As appellant points out, "Section 1054.6 provides: 'Neither the defendant nor the prosecuting attorney is required to disclose any materials or information which are work product . . . or which are privileged pursuant to an express statutory provision, or are privileged as provided by the Constitution of the United States.' Thus, discovery in criminal cases does not extend to any material or information covered by the attorney-client privilege (Evid. Code, § 954), the psychotherapist-patient privilege (Evid. Code, § 1014) or the Fifth Amendment's protection against self-incrimination." (*Andrade v. Superior Court* (1996) 46 Cal.App.4th 1609, 1612.) However, at the same time, there is no legal barrier to a party's valid waiver of these privileges. (Evid. Code, § 912, subd. (a) ["Except as otherwise provided in this section, the right of any person to claim a privilege provided by section 954 (lawyer-client privilege) . . . is waived with respect to a communication protected by the privilege, if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating [his] consent to the disclosure, including [his] failure to claim the privilege in any proceeding in which the holder has legal standing and the opportunity to claim the privilege"]. See also *Kerns Constr. Co. v. Superior Court* (1968) 266 Cal.App.2d 405, 413-414 ["When, with knowledge of their intended use, the privileged records were furnished to the witness, which act was not required to be performed, and the witness gave testimony from them, the privilege was waived"].)

Here, for all the reasons set forth above, it is reasonable to assume in light of the defense's imperfect self defense theory that appellant and his attorney considered it in their best interest to waive any privilege of confidentiality with respect to this letter. Appellant offers no evidence to the contrary. In particular, appellant makes no claim that he was coerced or deceived into waiving any privilege he may have possessed. Nor has he offered any affidavit from defense counsel attesting that counsel accidentally or

unfairly waived the privilege, or that he did so for any reason other than his good faith belief that it would assist in presenting appellant's case to the jury. As such, we decline to second guess defense counsel's tactical decisions in this regard. While appellant may now doubt the wisdom of his attorney's strategy with respect to this letter, hindsight regret is not grounds for reversal on appeal where, as here, an attorney's decisions are otherwise within the wide range of reasonable professional assistance. (*People v. Kraft, supra,* 23 Cal.4th at pp. 1068-1069 ["if the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal"]; see also *People v. Burnett, supra,* 71 Cal.App.4th at p. 180 ["defendant must overcome the presumption that, under the circumstances, the challenged action '*might be considered sound trial strategy*"].) Accordingly, we reject appellant's challenge to his attorney's competence.

Moreover, these same reasons support affirmance of the trial court's decision to deny appellant's motions to strike or for mistrial. Appellant, in essence, complains about the prosecution's use of the letter to cross-examine Dr. Minagawa on issues relating to his gang involvement given the inherent inflammatory nature of gang evidence. However, as the record from above reflects, appellant himself placed at issue his gang associations to support his imperfect self defense theory and, in particular, his alleged mental state that engendered an unreasonable belief in the need to protect against imminent peril. The prosecution had every right to counter this defense theory by proposing an alternative explanation for appellant's conduct on the day in question – to wit, that he was a knowing participant in the gang lifestyle, which tended to glamorize violence and promote its use as a means to earn and maintain respect. The fact that the prosecution's theory may have undermined appellant's case certainly does not compel a mistrial. (See *People v. Clark* (2011) 52 Cal.4th 856, 990 ["[a] trial court should grant a mistrial ' "only when a party's chances of receiving a fair trial have been irreparably damaged" ' "].) Accordingly, the trial court's decision to deny appellant's motions stands.

**V.    Cumulative Error.**

Finally, appellant contends the cumulative effect of the claimed errors was to deprive him of his right to due process under the federal Constitution. Under the "cumulative error" doctrine, we reverse the judgment if there is a "reasonable possibility" that the jury would have reached a result more favorable to defendant absent a combination of errors. (E.g., *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 ["Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial"].)

We reject this argument.  As we have discussed at length above, there were few if any errors made at trial, and no prejudicial error requiring reversal.  As the California Supreme Court explains, "Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice." (*People v. Hill* (1998) 17 Cal.4th 800, 844.)  Here, even assuming appellant's trial was imperfect, there has been no clear showing that a miscarriage of justice occurred.  (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795 ["The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial' "].)  The judgment thus stands.

## DISPOSITION

The judgment is affirmed.

_____
Jenkins, J.

We concur:


_____
McGuiness, P. J.


_____
Siggins, J.